UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JAMES "EDDIE" DOTSON          )
and wife, LYNN DOTSON,        )
                             )
            Plaintiffs,       )
                             )          NO. 1:08-cv-191
v.                           )          *Lee*
                             )
BOWATER, INC.,               )
                             )
            Defendant.        )

## MEMORANDUM AND ORDER

Before the Court is the motion of Defendant Bowater, Inc. ("Bowater") for summary judgment in this tort action brought by Plaintiffs James "Eddie" Dotson ("Dotson") and Lynn Dotson [Doc. 12]. For the reasons stated herein, Bowater's motion for summary judgment will be **GRANTED** and this action will be **DISMISSED WITH PREJUDICE**.

## I.     INTRODUCTION

Plaintiffs brought this tort action against Bowater in the McMinn County Circuit Court on July 7, 2008. Dotson alleged tort damages resulting from injuries he sustained on June 3, 2008, while working at the Bowater paper mill in Calhoun, Tennessee. Lynn Dotson alleged lost consortium. Bowater timely removed the action to this Court on August 13, 2008, pursuant to 28 U.S.C. §§ 1441(b). The motion for summary judgment is fully briefed [Doc. 12, 22, 25]. While the case was originally stayed due to a suggestion of bankruptcy, the stay has been lifted and the motion is now ripe for review. In its motion for summary judgment, Bowater does not contest the sufficiency of Dotson's negligence allegations. Instead, Bowater argues it is a statutory employer

– specifically, a principal contractor – and is thus immune from tort liability under Tenn. Code Ann. § 50-6-108 [Doc. 12 at 1].

## II.    EVIDENCE

Dotson's injury occurred while he was working at the kraft mill of the Bowater paper plant in Calhoun, Tennessee, on June 3, 2008 [Doc. 1-2 at ¶¶ 3-4; 3 at ¶ 4]. The kraft mill was shut down at the time of the injury [12-1 at 3]. The facts submitted by the parties relate both to the circumstances of the shutdown and the events leading up to Dotson's injuries.

In support of its motion, Bowater submitted the affidavit of Ronnie Jenkins, maintenance planner for Bowater's kraft mill [Doc. 12-1]. Additionally, both Bowater and Dotson submitted portions of Jenkins' deposition [Doc. 12-3; 21-4]. According to Jenkins, the kraft mill is a manufacturing facility where wood chips are treated with chemicals and heat to create pulp for making paper [Doc. 12-1 at 1]. The kraft mill operates on a continuous basis, except when there is a breakage [Doc. 12-3 at 7] or a "planned outage" (or "shutdown") [Doc. 12-1 at 1]. During a shutdown, the mill undergoes "repairs, routine maintenance, and other modifications to equipment" [*id.*]. Jenkins' job involves scheduling the tasks that need to be accomplished during each shutdown [*id.* at 2]. The planning process is "continual" in that Jenkins begins planning the next shutdown at the conclusion of each preceding one [*id.* at 2-3]. There is usually at least one shutdown per year which lasts more than two days [*id.* at 1]. Jenkins averred that the shutdowns are necessary "to ensure that Bowater has reliable operations and to ensure that the kraft mill is operating properly and efficiently." [*Id.* at 2].

The June, 2008, shutdown was originally scheduled for July, 2007, but was postponed to October, 2007, and then postponed again to June, 2008 [Doc. 21-4 at 4]. Jenkins explained that

2

planned shutdowns are often postponed or moved to other dates, and that Bowater "move[s] outages based on several conditions," including economics or production needs [*id.* at 6]. There were 272 maintenance tasks scheduled for the June, 2008, shutdown, during a 72-hour period, including Dotson's task [Doc. 12-1 at 3]. Dotson's specific task was the installation of two "anti-plugging valves" on "white liquor lines" in the kraft mill, and it was scheduled to be performed during a 24-hour window between 8:00 a.m. on June 3, 2008, and 8:00 a.m. on June 4, 2008 [*id.* at 3]. Jenkins averred that it was important that each task be completed at its scheduled time because Bowater loses approximately $16,000 for each hour that the mill is shut down [*id.* at 2]. During a shutdown, Bowater employees and outside contractors work around the clock to complete the scheduled work [*id.* at 1-2]. There are some 200 Bowater craftsmen [Doc. 12-3 at 5], and Jenkins schedules those employees to complete as much work as possible, assigning the remaining "overload" work to outside contractors [Doc. 12-1 at 2]. Although there are some tasks, such as fiberglass repair, that Bowater craftsmen cannot perform [Doc. 12-3 at 5], Jenkins stated at least 45 were qualified to perform the job assigned to Dotson [Doc. 12-1 at 3-4]. Jenkins stated that although anti-plugging valves had not ever been installed on the lines on which Dotson was working, repair, replacement, and installation of valves are "common example[s] of the type of maintenance regularly performed by Bowater's employees during an outage."[1] [*Id.* at 4]. Jenkins also averred that Bowater employees "installed and/or replaced [other] valves (including anti-plugging valves) on some tasks during the June 2008 outage." [*Id.* at 4]. Nonetheless, Dotson's task was assigned to an outside contractor

---

[1] According to Travis H. Barnett, who has worked for Bowater in the past, the pipelines in the kraft mill require "a lot of maintenance" [Doc. 12-9 at 2-3]. He confirmed that it is "not unusual" to change valves, and stated that "[e]very time they have a shutdown, they change valves." [*Id.* at 3].

because "[t]here were not enough Bowater maintenance employees available to do all of the maintenance tasks scheduled to be performed during the outage."[2] [*Id.* at 4].

Jenkins stated he and Paul Ingraham were responsible for deciding which tasks were to be assigned to outside contractors [Doc. 12-3 at 10-12]. Jenkins stated he would communicate with outside contractors before bidding in order to make sure everyone understood the "scope of the work" [*id.* at 16]. After this particular contract was let to S&H Erectors ("S&H"), Jenkins stated he "worked very closely with Virgil Lewis [of S&H]" and at some point, Lewis "subbed the job out" to Dotson [Doc. 21-4 at 9]. Jenkins stated that Bowater did not have control over whom was selected by S&H, except that "any particular contractor has to have gone through Bowater contractor training and safety orientation or they're not allowed in the mill." [*Id.* at 9]. Jenkins stated he assumed Dotson was working for S&H, and was not aware that Dotson was in fact an employee of Viking Industrial ("Viking") [*id.* at 10]. Jenkins communicated directly with Dotson "several times" to make sure he understood what needed to be done [Doc. 12-3 at 19; 21-4 at 15]. Jenkins emphasized that he communicated with Dotson about how to modify the valve [Doc. 12-3 at 21]. Jenkins stated, "[i]f you're not specific with how deep the flange should fall down from below the pipe, then your $6,000 antiplugging valve doesn't work." [*Id.* at 21]. According to Jenkins, no Bowater employees were assisting or supervising Dotson on the day he was performing the work

---

[2] Jenkins stated in his deposition that the work assigned to Dotson was originally identified as being beyond Bowater's manpower in preparation for the July, 2007, shutdown which was ultimately postponed to June, 2008 [Doc. 21-4 at 6-8]. Bowater entered into a contract with S&H Erectors which called for the work to be completed in July, 2007, but Jenkins stated the contract was "left open" by verbal agreement [*id.* at 7-8]. Pursuant to that agreement, the work was to be completed during the next shutdown, whenever that occurred [*id.*]. Keith Hensley, Bowater Purchasing Supervisor, explained that it is "not customary to redo [a purchase order where the work has been postponed] unless it's for a different service or a different good." [Doc. 25-2 at 2].

4

[Doc. 21-4 at 13-14]. Jenkins admitted that Dotson did not need supervision and that Dotson knew how to perform the job [*id.* at 16].

In Dotson's deposition, he described the work he performed for Bowater and the events that caused his injury [Doc. 21-1]. Dotson stated that in 2007, he was contacted by a Virgil Lewis, a representative of S&H, who informed Dotson that S&H had a job at Bowater and he gave Dotson the opportunity to submit a bid for work [*id.* at 5]. Dotson met Lewis at Bowater's facility, and Lewis showed him what needed to be done – the replacement of two ball valves with "antiplugging valves" on white liquor pipelines about 15-18 feet off the ground [*id.* at 5-9]. Dotson submitted a bid on behalf of his employer, Viking, which was accepted by S&H [*id.* at 4, 9].[3]

Dotson also explained the division of responsibilities with respect to the work.[4] Bowater was responsible for draining the white liquor from the pipes [Doc. 12-2 at 17; 21-1 at 13-14], supplying the scaffolding for accessing the pipes [Doc. 12-2 at 14], and providing the replacement valves [*id.* at 19]. Dotson confirmed that Bowater provided instruction on how to modify each valve so that its "stem" would protrude one inch into the pipe [*id.*]. Dotson was responsible for modifying the valves, supplying the other materials (e.g., pipe and fittings, welding material, welding equipment, and tools) [Doc. 21-1 at 11], bringing his own helpers [*id.* at 16], and supplying his own safety

---

[3] Dotson's bid was solicited and accepted by S&H [Doc. 21-1 at 10; 21-2]. Neither Dotson nor Viking contracted directly with Bowater to perform the work. [Doc. 21-6 at 2].

[4] These responsibilities are not memorialized in a written contract between Bowater and either Dotson or Viking. The only written contract is a June, 2007, purchase order between S&H and Bowater [Doc. 21-9 at 1; 12-6 at 3 (deposition of David Keith Hensley, Bowater Purchasing Supervisor); 21-9 at 2; 12-7 at 3 (deposition of Curtis Swindell, Jr., Bowater Contractor Coordinator)]. That document states, in pertinent part, that "Bowater will furnish 2" anti-plugging valves / 2" weld neck flanges / gaskets" and that "S&H will install valves and install piping from outlet of anti-plugging valves to u-drain at ground level. S&H will also remove existing drain valves and blank off --" [Doc. 21-5].

equipment [*id.* at 17].

Dotson went to the facility the day before the work was to be performed to make sure that the scaffolding Bowater had provided was in place [Doc. 12-2 at 14]. On the morning of the accident, Dotson arrived at the Bowater facility and was met by Ronnie Jenkins and Paul Ingraham, whom Dotson identified as "maintenance managers" for Bowater[5] [*id.* at 21]. They informed Dotson that the white liquor pipelines were "drained and cleaned and ready to go to work." [*Id.* at 22]. Before he began, Dotson discovered that one of the pipelines (the "northern line") had not been drained, so he went "looking for Ron [Jenkins] or Paul Ingraham." Dotson found Ingraham and another Bowater employee and reported the problem [*id.* at 23-24]. Ingraham told Dotson, "due to the circumstances of the shutdown," to "go ahead and work on the one that was drained" [*id.* at 23-24], and Dotson proceeded to do so [*id.* at 25]. While Dotson was welding the new valve in place on the drained line (the "southern line"), he backed up on the scaffolding "to get a part for the welding rig." [*Id.* at 28]. He was wearing a safety harness that was anchored by a rope to a point above him, and the harness "got caught on" the valve for the northern line [*id.* at 27-28]. When Dotson started to walk back to the southern line, the northern line's valve opened and spilled white liquor on his back and left side, down to his left knee [*id.* at 28; 21-1 at 19], causing first degree burns to his face and upper back and third degree burns on his left buttock and leg [Doc. 12-2 at 33-34].

Dotson was required, prior to entering the Bowater facility, to complete an online safety orientation [*id.* at 5-7]. Dotson also stated he was aware that valves need to be changed out in

---

[5] Jenkins' actual position is Kraft Mill Maintenance Planner and Ingraham's position is Kraft Mill Superintendent [Doc. 21-9 at 1].

6

facilities like Bowater's "from time to time," and that such replacements would have to occur during shutdowns [*id.* at 31-32]. He was aware that Bowater employees are capable of changing out valves [*id.* at 32].

Both Bowater and Dotson rely upon portions of the deposition of Paul Ingraham [Doc. 12-4; 21-3], superintendent of the kraft mill [Doc. 21-9 at 1]. Ingraham confirmed that Dotson was at the Bowater facility as an employee of Viking to "replac[e] an existing drain line with a new style drain valve on a process line." [Doc. 21-3 at 12]. Ingraham stated that maintenance had previously been performed on the white liquor lines, but the drain valves had not been replaced before [Doc. 12-4 at 7]. According to Ingraham, it was not the sort of work that needed to be performed on an ongoing or periodic basis [Doc. 21-3 at 23]. Ingraham also confirmed that Bowater had employees with the "training, experience, and expertise" to perform the job assigned to Dotson, but that there were not enough Bowater technicians to do all the work scheduled during the shutdown [Doc. 12-4 at 7]. Ingraham stated that it was important to Bowater, for purposes of "efficient planning" and "proper[] manage[ment]," that the various tasks were "properly timed" and actually performed during their scheduled time slots [*id.* at 8-10]. He admitted there were no other tasks scheduled during the shutdown that could not have been performed until after Dotson's task was completed [Doc. 21-3 at 20-21]. Finally, Ingraham recalled his conversation with Dotson on the morning of the accident and confirmed that Dotson reported one of the lines had not been drained and that he instructed Dotson to work on the drained line [Doc. 12-4 at 13].

## III. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Id.* A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *National Satellite Sports*, 253 F.3d at 907.

## B.     Tennessee Worker's Compensation Law

Under the Tennessee Worker's Compensation Law ("TWCL")[6], an employee is entitled to worker's compensation benefits for injuries sustained during employment, regardless of whether the injuries were caused by the employer's negligence. Tenn. Code Ann. § 50-6-103; *Mathis v. Bowater Inc.*, 985 F.2d 277, 278 (6th Cir. 1993). The TCWL, however, bars the employee from recovering damages in tort for the employer's negligence. Tenn. Code Ann. § 50-6-108; *Lyness v. Bowater,*

---

[6] Because jurisdiction in this Court is founded on diversity, Tennessee substantive law applies. *See Mathis v. Bowater Inc.*, 985 F.2d 277, 278 (6th Cir. 1993).

8

*Inc.*, No. 90-6322, 1991 WL 158712, *2 (6th Cir. Aug. 19, 1991). Employees' spouses are also barred from pursuing claims for lost consortium. *Lambert v. Tennessee Valley Authority*, 2002 WL 32059747, at *3 (E.D. Tenn. Sep. 17, 2002) (citing *Nichols v. Binco Plastics, Inc.*, 469 S.W.2d 135 (Tenn. 1971)).

The obligation to pay worker's compensation benefits, and the attendant tort immunity that comes with the obligation, "is expanded beyond [the employee's] direct employer" to include "statutory employers." *Id.* at *3 (E.D. Tenn. Sep. 17, 2002); *see also Murray v. Goodyear Tire & Rubber Co.*, 46 S.W.3d 171, 175 (Tenn. 2001) (tort action against statutory employer "cannot be maintained"). The TWCL provides, in relevant part, that "a principal . . . contractor shall be liable . . . to the same extent as the immediate employer" for injuries occurring on the principal contractor's premises. Tenn. Code Ann. § 50-6-113. Generally, a "principal contractor" is a company that has undertaken work for another entity. *Lindsey v. Trinity Communications, Inc.*, 275 S.W.3d 411, 421 (Tenn. 2009); *Brown v. Canterbury Corp.*, 844 S.W.2d 134, 137 (Tenn. 1992). A company which undertakes work for its own benefit will be a principal contractor if (1) the company "retains the right of control over the conduct of the work and the subcontractor's employees" or (2) "'the work being performed by a subcontractor's employees is part of the regular business of the company or is the same type of work usually performed by the company's employees. *Id.*

## C. Bowater's Interrogatory Answer Identifying S&H Erectors as "General Contractor"

Dotson argues Bowater has created a genuine issue of material fact as to its status as "principal contractor" by identifying S&H as its "general contractor" for the job [Doc. 22 at 13]. In response to an interrogatory requesting that Bowater provide the name of the "general contractor," if any, for the job Dotson was performing when he was injured, Bowater identified S&H

9

Erectors [*id.*; 21-6 at 5-6]. Dotson argues that a "general contractor" is legally equivalent to a "principal contractor," and that Bowater, an experienced litigant, was or should have been aware of the significance of its answer [Doc. 22 at 13]. Dotson cites several cases using the terms "general contractor" and "principal contractor" interchangeably. *See*, *e.g.*, *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 148 (Tenn. 2007) (stating "a principal contractor (i.e., a general contractor) may be liable").

To hold that a company cannot be a principal contractor simply because it identifies another entity as "general contractor," however, would be "to honor form over substance." *Brown*, 844 S.W.2d at 137. Moreover, Dotson's argument misconceives the nature of the Court's inquiry. Bowater's status (either as a general or principal contractor) is not a question of fact, but is rather the ultimate legal question in this motion for summary judgment.[7] *See Posey v. Union Carbide Corp.*, 510 F. Supp. 1143, 1144 n.1 (D. Tenn. 1981) (holding defendant's status as principal contractor was "wholly legal in nature" where underlying facts in summary judgment motion were undisputed); *Harness v. Bechtel Jacobs Co.*, LLC, 2007 WL 10447 (Tenn. Ct. App. 2007) ("where the facts are basically undisputed, [whether the worker's compensation statute applies] is a question of law for the courts"). Thus, Bowater's answer to Dotson's interrogatory is, in itself, insufficient to create an issue of fact as to Bowater's status. Instead, the Court must determine whether there

---

[7] In this sense, Dotson's argument may be read as one of estoppel – that Bowater, having once claimed another entity was the "general contractor," should not be allowed to assert now it is a "principal contractor." Application of the doctrine of judicial estoppel is appropriate where a party (1) takes inconsistent positions in litigation (2) in an attempt "to play fast and loose" with the court. *National Utility Serv., Inc. v. Chesapeake Corp.*, 45 F. Supp. 2d 438, 445 (D.N.J. 1999). Here, however, Bowater has not ever taken the position that it was *not* a principal contractor, and even if Bowater's positions are inconsistent by inference, there is no suggestion Bowater has acted in bad faith.

10

is a genuine issue of material fact with respect to the tests used by Tennessee courts to determine whether Bowater is a principal contractor. *See Anderson*, 477 U.S. at 248 (stating that "[a]s to materiality, the substantive law will identify which facts are material."). In this case, those tests require the Court to ask whether Bowater "retain[ed] the right of control over the conduct of the work and the subcontractor's employees" or "the work being performed by [Dotson was] part of [Bowater's] regular business . . . or is the same type of work usually performed by [Bowater's] employees." *Lindsey*, 275 S.W.3d at 421.

### D.     Right to Control the Work

A company is a principal contractor if it retains the right to control three dimensions of the work: the subcontractor's employees, the manner in which the job is performed, and the materials to be used. *Lindsey*, 275 S.W.3d at 421 (citing *Stratton v. United Inter-Mountain Telephone Co.*, 695 S.W.2d 947, 953 (Tenn. 1985)). It is not necessary that the right of control actually be exercised, so long as it exists. *Murray v. Goodyear Tire & Rubber Co.*, 46 S.W.3d 171, 176 (Tenn. 2001). In this case, I **FIND** there is no genuine issue of material fact with respect to whether Bowater had control over the manner of the work or the materials to be used, but that it is difficult at this juncture to determine whether Bowater had either direct or indirect control over Dotson. I therefore **CONCLUDE** that summary judgment on this ground would be premature.

### 1.     Control over the "manner" of the work

Control over the "manner" in which the work is performed means that the company has control over more than "the results" of the work. *Lindsey*, 275 S.W.3d at 421. In other words, a company's contractual right to make the subcontractor "redo" unsatisfactory work does not mean that the company has control over the "manner" in which the subcontractor's workers perform the

11

job. *Murray*, 46 S.W.3d at 176. However, the company need not dictate the minutiae of the work; it is enough that it have control over the "general manner" in which the work is performed. *Stratton*, 695 S.W.2d at 953. In *Lindsey*, the company did not control the work where it "provided no instruction" with respect to how the worker did his job. 275 S.W.2d at 421. In *Murray*, similarly, the court found that the company had no control over the manner of the work where it did not supervise the worker or require that he use specific methods. 46 S.W.3d at 177. On the other hand, in *Acklie*, the company had control over the work because it "coordinated the work, made changes periodically in the plans and had work redone, and its . . . employees performed a substantial part" of the work. 785 S.W.2d at 358. As one factor in this analysis, a company's control over the timing of the work may show control over the manner in which the work is performed, *Stratton*, 695 S.W.2d at 953 (company had control over the work because it had the right to dictate the order in which the tasks were performed), but it is not enough that the company merely provided a "general time frame" during which the worker could perform the task "at his convenience." *Murray*, 46 S.W.3d at 177.

This is not a case, as in *Lindsey*, where Bowater "provided no instruction" to Dotson regarding how he was to perform his job. 275 S.W.2d at 421. Dotson contends there is a genuine issue of fact in that Bowater did not specifically instruct Dotson how to install the anti-plugging valves, noting that "Mr. Dotson knew how to do the work." [Doc. 22 at 5]. But it is not surprising that Bowater did not tell Dotson how to install the valves. In fact, it is unlikely they would have hired someone who did not know how to install valves. Bowater did, however, instruct Dotson specifically how to modify the valves so that their stems would protrude the correct distance into the pipes [Doc. 12-2 at 19-20; 12-3 at 21]. It was important that Dotson follow these instructions,

because otherwise the valve would not have worked [Doc. 12-3 at 21]. Bowater also gave Dotson instruction on how to proceed after he discovered that one of the lines was not drained--instructions which Dotson followed [Doc. 12-2 at 23-25]. Furthermore, Dotson has shown no issue of fact as to whether Bowater *could* have told him how to perform the installation had there been any need for such instruction. *See Murray*, 46 S.W.3d at 176 (control need not be exercised to exist).

Instead, as in *Acklie*, Bowater coordinated the work to be done during the shutdown [Doc. 12-1 at 2], changed work plans periodically when it postponed the shutdown [Doc. 21-4 at 6-8], and Bowater employees performed a substantial part of the work during the shutdown [Doc. 12-1 at 2]. In addition, Bowater exercised close control over the timing of the work, scheduling a narrow 24-hour window for Dotson's task as one of many to be accomplished during the shutdown [*id.* at 3]. *See Stratton*, 695 S.W.2d at 953. I **FIND** there is no genuine issue of fact militating against the conclusion that Bowater had control over the manner in which the work was to be performed.

### 2. Control over the materials to be used

A company controls the materials to be used when it provides those materials. *Compare Lindsey*, 275 S.W.3d at 411 (noting that the company provided the materials) *with Murray*, 46 S.W.3d at 177 (where the company contracted out the work because it lacked the equipment or materials to do the job itself, this dimension of control was lacking). Here, there is no dispute that Bowater provided the valves to be installed and exercised control over how the valves were to be modified. In addition, Bowater provided the scaffolding used by Dotson to access the pipes. Dotson argues Bowater lacked control over the materials used because he "brought his own equipment to the job" [Doc. 22 at 5]. However, Dotson does not dispute that Bowater provided the valves he was

13

installing or the scaffolding.[8]  Moreover, Dotson brought some of the equipment with him because he was *required* by Bowater to do so [Doc. 12-2 at 25].  I **FIND** there is no genuine issue of fact with respect to whether Bowater had control over the materials used by Dotson.

### 3.    Control over the subcontractor's employees

A company may have either direct or indirect control over a worker in the employ of its subcontractor.  *Compare Murray*, 46 S.W.3d at 176 (suggesting that a company would have control over its subcontractor's employee if it had the right to terminate the employee) *with Stratton*, 695 S.W.2d at 953 (company had the requisite degree of control where it could exert pressure on the subcontractor to remove a worker).  The inquiry here is not whether the company controls *how* the work is done, but rather, whether the company controls *by whom* it is done.  *See Lindsey*, 275 S.W.3d at 421 (company "did not control which employees worked on the job").  Tennessee courts make this determination by analyzing the company's relationship with the worker.  *See id.*, 275 S.W.3d at 421; *Murray*, 46 S.W.3d at 176.  In *Lindsey*, this dimension of control was lacking where the company had no knowledge that its contractor had subcontracted the work to the plaintiff.  275 S.W.3d at 421.  Similarly, in *Murray*, the court held that the company lacked control where it did not hire the worker, did not negotiate with him, did not pay him directly, and did not have the right to terminate him.  46 S.W.3d at 176.

As noted above, it is difficult at this juncture to determine whether Bowater's relationship with Dotson created the requisite degree of control.  On the one hand, Bowater employees

---

[8]  Dotson does dispute that the scaffolding was installed for his benefit.  He argues the scaffolding must have been for the benefit of the workers draining the white liquor lines, because Bowater had never provided him with scaffolding before [Doc. 22 at 22].  Whomever the scaffolding was installed *for*, however, there is no dispute that Bowater provided it and Dotson used it to access the pipes.  Indeed, Dotson stated he visited Bowater's facility the day before the job was to be performed in order to make sure the scaffolding was in place [Doc. 12-2 at 14].

14

communicated directly with Dotson before he began working [Doc. 12-3 at 19, 21; 21-4 at 15]. In addition, after reporting that the northern line was not drained, Dotson sought out instructions from Ingraham and followed those instructions to begin working on the southern line [Doc. 12-2 at 23-25]. On the other hand, while Bowater knew that Dotson would be performing the work, it had no knowledge that S&H had subcontracted the job out to Viking [Doc. 21-4 at 10], *See Lindsey*, 275 S.W.3d at 421, and there is no indication that Bowater had the ability to request that Dotson be terminated if he performed unsatisfactorily, *see Stratton*, 695 S.W.2d at 953. Indeed, as in *Murray*, it appears that Bowater played no role in hiring Dotson, had no contractual relationship with him, did not negotiate with him, and did not incur an obligation to pay him directly [Doc. 21-4 at 10-11]. Bowater argues it had control over who worked at its facility by virtue of its "safety orientation" requirement [Doc. 25 at 9]. However, supervision "to ensure compliance with . . . safety regulations applicable to every worker in the building," by itself, does not show the requisite degree of control. *Murray*, 46 S.W.3d at 177. The record with respect to Bowater's control over Dotson's employment would benefit from more factual development, and summary judgment would therefore be premature. *See Bletz v. Gribble*, 2009 WL 2132729, at *9 (W.D. Mich. Jul. 10, 2009).

E. **Part of Regular Business / Same Type of Work**

Although Bowater is not entitled to summary judgment by virtue of a "right to control," it is still entitled to summary judgment as a principal contractor because there is no genuine issue of material fact with respect to whether the work Dotson was performing was a part of Bowater's "regular business" or was of the same type usually performed by its own employees. *See Lindsey*, 275 S.W.3d at 421-422.

15

### 1. Regular business

"Whether work is a regular part of the business of any entity is a fact-specific inquiry, relative to the size and scope of the business." *Lindsey*, 275 S.W.3d at 422. One factor relevant to the "regular business" inquiry is the frequency with which the type of work is carried out. *See Brown*, 844 S.W.2d at 138 (quoting Larson, *Workmen's Compensation*, § 49.16(c) (1991) for the proposition that when a company has an "ongoing program" of construction, a particular construction job delegated to a contractor will nonetheless be a part of its regular business). Work may be a part of a company's regular business, however, even if it is carried out only infrequently. *See Lindsey*, 275 S.W.3d at 421-22. Indeed, some types of work will be needed only infrequently by their very nature. *See*, *e.g.*, *id.* In *Lindsey*, the court determined whether the installation of a cable television system was a part of a company's regular business not by looking at its frequency, but by comparing the size and difficulty of the work with the ability of the company to perform it. *Id.* Thus, another relevant factor is the company's capacity to perform the work – i.e., whether the work is more "extensive [or] specialized" than the company could perform. *See Lindsey*, 275 S.W.3d at 422 (citing *Murray*, 46 S.W.3d at 175-76). A third factor is whether the work is inherent or necessary in the carrying on of the business. *See Agarwal v. Tennessee Valley Authority*, 2005 WL 2219113, at *5 (concluding that maintenance work was part of TVA's regular business because the "size and nature" of that business "requires TVA to have an extensive ongoing program of constant construction, modification, replacement, and maintenance service."); *Murray*, 46 S.W.3d at 177 (noting that the component being maintained was "vital" to the business, but holding that this factor was overcome by the fact that the company had never done the type of work before).

Consistent with these principles, the type of work at issue here – maintenance during an

16

infrequent shutdown – has been found to be a part of a company's regular business. *Lambert v. Tennessee Valley Authority*, 2002 WL 32059747 (E.D. Tenn. Sep. 17, 2002); *Randolph v. Eastman Chem. Co.*, 180 S.W.3d 552 (Tenn. Ct. App. 2005). In *Lambert*, the employee of a contractor ("S&W") hired by the defendant ("TVA") was injured while performing maintenance on an ice condenser, a component of the facility required to be inspected, serviced, and replenished with ice once every 18 months. 2002 WL 32059747, at *2. Each maintenance cycle lasted around the clock for 20 days, and involved both TVA personnel and independent contractors. *Id.* This Court held that the maintenance project was a part of TVA's regular business, noting that TVA "routinely and continuously engages in modification and maintenance services on its facilities," and that TVA had in the past "carried out its maintenance duties through its own employees" and retained the ability to do so under its contract with S&W. *Id.* at *4-5 (Edgar, Chief Judge). The Court also observed that the work at issue was "an inherent part of carrying on" TVA's business. *Id.* at *4.

Similarly, in *Randolph*, defendant Eastman Chemical ("Eastman") shut down its plant for 20 days, once every two years, for cleaning, inspections, capital improvements, and repairs. 180 S.W.3d at 555. Planning for a shutdown often "start[ed] immediately on completion of the [previous] shutdown," and Eastman's maintenance coordinators planned the shutdown work on an "hour-to-hour" basis. *Id.* Eastman's employees performed much of the work, but Eastman hired a contractor to perform "non-destructive electromagnetic testing" because it lacked the equipment to perform those tests itself. *Id.* The Tennessee Court of Appeals held that the testing was part of Eastman's regular business because "either a shutdown or the planning for a shutdown is ongoing by Eastman most all of the time," and Eastman employees plan the shutdown work and conduct much of the work. *Id.* at 558-59. The court also found it significant that the shutdown work "must

17

be done" to ensure the plant operates "properly, effectively, and in compliance with applicable safety regulations." *Id.* at 558.

In this case, the work Dotson was performing falls well within the rule of *Lambert* and *Randolph*. First, the work was more than frequent; it was "ongoing." *See Randolph*, 180 S.W.3d at 559. Planning for a shutdown is a continual and ongoing process, and planning for the next shutdown begins as soon as the previous shutdown is concluded [Doc. 12-1 at 2-3]. Dotson contends that Bowater's shutdowns were not a "regular" part of its business because they were not "set, regular, or predictable," and they were often "moved and adjusted" [Doc. 22 at 8-9]. Dotson's facts, however, are not material. Bowater regularly worked to plan and schedule the repairs that would occur during the shutdown, and under Tennessee law, it is not important that the shutdowns themselves were infrequent. *See Randolph*, 180 S.W.3d at 558-59.

Second, Bowater had the capacity to perform the work using its own employees, but merely lacked the personnel to do all the shutdown jobs during the time allotted [Doc. 12-1 at 2]. Bowater employees performed as much of the work as possible, with independent contractors merely making up the balance [*id.*]. Bowater submitted competent, undisputed evidence that at least 45 of its maintenance employees had the experience and skill to perform the work assigned to Dotson [*id.* at 3-4]. Dotson claims that the work he was performing was unusually specialized or difficult because it involved working on lines containing hazardous chemicals and located 15 to 18 feet off the ground [Doc. 22 at 10]. Dotson, however, has failed to present any facts tending to show that Bowater's employees were incapable of doing the work. *See Agarwal*, 2005 WL 2219113, at *5 (where company showed it was in the business of maintaining nuclear power plants, plaintiff's allegations that his services were unique and specialized did not create a genuine issue of fact that

18

the company's employees were incapable of performing the same work).

Third, the work being performed during the shutdown was inherent in Bowater's business. Bowater submitted evidence that the repair work was necessary "to ensure that Bowater has reliable operations and to ensure that the kraft mill is operating properly and efficiently." [Doc. 12-1 at 2]. Bowater is a large company with 200 craftsmen available to perform maintenance and repairs [Doc. 12-3 at 5], and it operates around the clock [Doc. 12-1 at 1; 12-3 at 7]. With $16,000 per hour at stake whenever the kraft mill is not operating [Doc. 12-1 at 2], it is clear that performing maintenance is necessary to Bowater's business.

Dotson argues *Lambert* and *Randolph* are distinguishable because they involve a "two-tiered" contractor hierarchy, in which the injured employee worked for a contractor hired directly by the defendant company. In contrast, Dotson argues, he was working at the bottom of a "three-tiered" hierarchy because he was employed by Viking, which contracted with S&H, which in turn contracted with Bowater [Doc. 22 at 14-15]. This distinction is irrelevant. The function of the statutory employer provision is to "extend[] the benefits and burdens of the workers' compensation laws up the line" from the subcontractor all the way to the principal contractor. *Lyness v. Bowater, Inc.*, 1991 WL 158712 at *1 (6th Cir. 1991) (unpublished). The provision is necessary "precisely *because*" employees of subcontractors will normally have an attenuated relationship with the principal contractor. *Id.*

Accordingly, I **FIND** no genuine issue of material fact with respect to whether the work being performed by Dotson was a part of Bowater's regular business.

### 2.     Type of work

In addition, the replacement of valves in the kraft mill was precisely the type of work

regularly performed by Bowater employees. Bowater submitted evidence that the repair, replacement, and installation of valves are "common example[s] of the type of maintenance regularly performed by Bowater's employees." [Doc. 12-1 at 4]. Dotson himself stated in his deposition that he was aware that valves in the kraft mill needed to be changed occasionally, and that Bowater employees were capable of doing that work [12-1 at 31-32]. Dotson argues now that the work he was performing was not the type of work typically performed by Bowater employees because the valves he was replacing had never been replaced before and, indeed, there was no need to change those valves on a regular basis [Doc. 22 at 24-25]. Dotson's argument focuses too narrowly on the particular valves he was tasked with replacing. Bowater readily admits these valves had not previously been replaced [Doc. 21-3 at 23], but points out that other maintenance had been performed on the same pipelines [Doc. 12-4 at 7], and that Bowater employees changed other valves during the June, 2008, shutdown [Doc. 12-1 at 4]. I **FIND** no genuine issue of material fact with respect to whether Bowater employees performed the *type* of work Dotson was performing on June 3, 2008.

In sum, this appears to be a "classic case of a business acting as its own principal contractor." *Lyness*, 1991 WL 158712, at *2. The purpose of the "statutory employer" provision is to "prevent[] employers from contracting out *normal work* simply to avoid liability for worker's compensation" and to "encourage employers to hire responsible, insured subcontractors." *Lindsey*, 275 S.W.3d at 420 (quoting *Stratton v. United Inter-Mountain Telephone Co.*, 695 S.W.2d 947 (Tenn. 1985)) (emphasis added). The work Dotson was performing is exactly the sort of "normal work" that the statute seeks to encompass. If Bowater could avoid workers' compensation liability for its dangerous maintenance projects simply by contracting them out, it would have little incentive to

ensure that its contractors carry worker's compensation insurance.

After careful consideration, I **CONCLUDE** Bowater is entitled to judgment as a matter of law, because Bowater, as a principal contractor, is immune from tort suits brought by its statutory employees.  *See Murray*, 46 S.W.3d at 175.

IV.     **CONCLUSION**

For the reasons set out above, Bowater's motion for summary judgment [Doc. 12] is **GRANTED** and this action will be **DISMISSED WITH PREJUDICE**.  A separate judgment will enter.

SO ORDERED.

ENTER:


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

21